IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Danny Kerbs, | NO. C 09-00910 JW |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| Ed Foulk, Dir. of Napa State Hosp., | |
| Respondent. | |

## I. INTRODUCTION

This matter is now before the Court for consideration of Danny Kerbs' ("Petitioner") Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[1] concerning the extension of his commitment to Napa State Hospital. For the reasons set forth below, the Petition is DENIED as to all claims. In addition, no certificate of appealability will be issued for Petitioner's claims.

## II. BACKGROUND

**A.  Facts**

The California Court of Appeal summarized the facts and trial history of Petitioner's case as follows:[2]

> On July 9, 1998, [Petitioner] entered a plea of not guilty by reason of insanity to making criminal threats ([section] 422), assault with a deadly weapon ([section] 245,

---

[1] (hereafter, "Petition," Docket Item No. 1.)

[2] (Points and Authorities in Support of Petition for Writ of Habeas Corpus, hereafter, "Petitioner's Memorandum," Ex. 1, Opinion of the California Court of Appeal, hereafter, "Appeal," Docket Item No. 2.) All unspecified code sections refer to the California Penal Code.

subd[ivision] (a)(1)), exhibiting a deadly weapon in a threatening manner ([section] 417, subd[ivision] (a)(1)), and theft ([section] 484, subd[ivision] (a)). According to the police report, [Petitioner's] offenses occurred on July 13, 1997, when he was homeless and came upon a man at the side of the road who was fixing a trailer. [Petitioner] walked up and began yelling at the victim that the victim was a "child molester" and a "bank robber." [Petitioner] picked up a screwdriver that was next to the victim. When the victim attempted to get the screwdriver back, [Petitioner] raised the screwdriver above his head in a threatening manner and stated, "Get away punk, or I'll stab you."[3] On September 25, 1998, [Petitioner] was committed to Napa State Hospital for a maximum term of four years, and his commitment was thereafter extended three times. His commitment was set to expire on July 10, 2007.

On April 5, 2007, the district attorney filed a petition to extend [Petitioner's] commitment pursuant to section 1026.5, subdivision (b). The petition alleged that "by reason of mental disease, defect or disorder, the [Petitioner] represents a substantial danger of physical harm to himself and others."

[Petitioner] and the People waived the right to a jury trial. At the end of the trial, the court found that the district attorney proved beyond a reasonable doubt that [Petitioner] suffers from a mental disease, defect, or disorder, and as a result of this condition, [Petitioner] poses a substantial danger of physical harm to others. [Petitioner] interjected that the people who testified were not doctors and do not have licenses. The court responded that one was a psychologist and [Petitioner] remarked, "That guy is mentally retarded." The court continued: "Okay. But I do feel that you don't recognize your mental health issues, and that you don't agree with their—agree with their evaluation of you. Without that insight of knowing what the diagnosis is, what you suffer from, I think it prevents you from getting better and being able to participate in . . . any . . . program." The court also stated that it was concerned about [Petitioner] taking his medications and his not appreciating the danger involved with the underlying incident. The court therefore committed [Petitioner] for an additional two years to July 10, 2009.

[Petitioner] filed a timely notice of appeal.

(Appeal at 1-3.)

**B.   Case History**

On July 9, 1998, Petitioner pleaded not guilty by reason of insanity to, *inter alia*, making criminal threats and assault with a deadly weapon. (Appeal at 1.) On September 25, 1998, Petitioner was committed to Napa State Hospital for a maximum term of four years. (Id. at 2.) Petitioner's commitment was subsequently extended three times and was set to expire on July 10,

---

[3] [Petitioner's] account of the incident [is as follows]: "I lived in Maui and tried to hitchhike to mom's home in Portland. I passed a trailer and thought there were baby rapers and bank robbers inside and told the person who was outside the trailer that. I then picked up a screwdriver and threw it toward the fence. I was not psychotic. I was just trying to bother the guy. When the police came, the officer tried to reach inside my butt and I tried to scream rape, but that is not in the record." When asked about the significant difference between [Petitioner's] account and the police report, [Petitioner] said, "[T]he cops were trying to cover up that they tried to rape me." (Appeal at 2.)

2

2007. (Id.) On April 5, 2007, the district attorney filed a petition to further extend Petitioner's commitment. (Id.) On June 12, 2008, Petitioner waived his right to a jury trial and the state court, after a bench trial, extended Petitioner's commitment to July 10, 2009.[4]

On August 20, 2008, the California Court of Appeal affirmed the trial court's extension of Petitioner's commitment to July 10, 2009. (Appeal at 12.) On October 28, 2008, the California Supreme Court denied review. (Respondent's Memorandum at 1.) On March 2, 2009, Petitioner filed his Petition.[5] On November 20, 2009, Respondent filed his Answer.[6] On December 16, 2009, Petitioner filed his Traverse. (See Traverse, Docket Item No. 12.)

### III. STANDARDS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than deciding the claim on the basis of a

---

[4] (Id. at 2, 7; Memorandum of Points and Authorities in Support of Answer at 1, hereafter, "Respondent's Memorandum," Docket Item No. 11.)

[5] (See Petition; Petitioner's Memorandum.) The Petition challenges the extension of Petitioner's commitment to July 10, 2009. (See Petition.)

[6] (See Answer to Order to Show Cause, hereafter, "Answer," Docket Item No. 11.)

3

1 procedural rule. Barker v. Fleming, 423 F.3d 1085, 1092 (9th Cir. 2005); Lambert v. Blodgett, 393
2 F.3d 943, 969 (9th Cir. 2004).

**A.      "Clearly Established Supreme Court Law"**

Clearly established federal law, as determined by the Supreme Court of the United States refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. See Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000); Barker, 423 F.3d at 1093. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by the Supreme Court." Williams, 529 U.S. at 391 (referring to case-by-case analysis applicable to ineffective assistance of counsel claims); see, e.g., Jackson v. Giurbino, 364 F.3d 1002, 1009 (9th Cir. 2004). There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Lockyer v. Andrade, 538 U.S. 63, 64 (2003). When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. Id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

4

**B.     "Contrary To"**

While the "contrary to" and "unreasonable application" clauses have independent meaning, they often overlap. See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer, 538 at 70-73 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Early v. Packer, 537 U.S. 3, 8 (2002) (*per curiam*). A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

**C.     "Unreasonable Application"**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13; see also Brown v. Payton, 544 U.S. 133, 141-43 (2005).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; Middleton v. McNeil, 541 U.S. 433, 436 (2004) (*per curiam*); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (*per curiam*) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

The objectively unreasonable standard is not a clear error standard. Lockyer, 538 U.S. at 75-76. After Lockyer, "[t]he writ may not issue simply because, in [the federal court's] determination, a state court's application of federal law was erroneous, clearly or otherwise. While

5

1  the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater
2  degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them."
3  Clark, 331 F.3d at 1068. Thus, deciding whether the state court decision was unreasonable may
4  require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045,
5  1054 (9th Cir. 2003).

6  Finally, habeas relief is warranted only if the constitutional error at issue is a structural error
7  or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v.
8  Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

9  Where, as in this writ, the California Supreme Court denies review of Petitioner's claim
10 without explanation, the Court looks to the last reasoned state court decision in conducting habeas
11 review. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citation omitted)
12 (holding that the district court "looks through" the unexplained California Supreme Court decision
13 to the last reasoned state court decision), cert. denied, 534 U.S. 944 (2001). The California Court of
14 Appeal rendered the last reasoned state court decision in Petitioner's case.

### IV. DISCUSSION

16 Petitioner makes a single claim regarding the trial court's extension of Petitioner's
17 commitment to July 10, 2009 pursuant to Cal. Pen. Code § 1026.5(b) ("Section 1026.5(b)"). (See
18 Petitioner's Memorandum at 14.) Petitioner contends that there was no showing that he was unable
19 to control his dangerous behavior, which is required under the Due Process Clause of the Fourteenth
20 Amendment to civilly commit an individual without that individual's consent. (Petition at 14.) The
21 Court first considers, *sua sponte*, whether the Petition is moot and then considers the merits of
22 Petitioner's constitutional claim.

**A.   Mootness**

24 At issue is whether the Petition is moot because Petitioner's commitment at the state hospital
25 appears to have ended on July 10, 2009.

26 Article III, § 2 of the Constitution requires the existence of a "case" or "controversy"
27 throughout all stages of federal judicial proceedings. This means that, during the entire pendency of

6

the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990). "[A] dispute solely about the meaning of a law, abstracted from any concrete actual or threatened harm, falls outside the scope of the constitutional words 'Cases' and 'Controversies.'" Alvarez v. Smith, 130 S. Ct. 576, 580-81 (2009) (citations omitted). Mootness can "arise at any stage of litigation." Calderon v. Moore, 518 U.S. 149, 150 (1996) (citing Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974)). Federal courts may not "give opinions upon moot questions[.]" Mills v. Green, 159 U.S. 651, 653 (1895).

Here, Petitioner's commitment was extended to July 10, 2009. Neither party has provided the Court with a clear representation of Petitioner's current status—e.g., whether he has been released. However, the Court finds that good cause exists to address the Petition and the constitutionality of the extension of Petitioner's commitment to July 10, 2009, since the record does not clearly indicate whether Petitioner has been released from the custody of the Napa State Hospital.

Accordingly, for present purposes, the Court does not find the Petition moot.

**B.     Civil Commitment**

At issue is whether Petitioner's due process right under the Fourteenth Amendment was violated by the extension of his civil commitment to July 10, 2009. (Petitioner's Memorandum at 14.) Petitioner contends that the California Court of Appeal erred in affirming the extension of his commitment, since the trial court did not make an explicit finding that Petitioner was unable to control his behavior. (Id.) Respondent contends that Supreme Court precedent supports the Court of Appeal's analysis. (Respondent's Memorandum at 5.)

**1.     Legal Standard for Involuntary Commitment**

Under the Due Process Clause of the Fourteenth Amendment, a state may order involuntary civil commitment of an individual pursuant to a state statute which requires both "proof of dangerousness" and "proof of some additional factor, such as a mental illness or mental

7

abnormality."[7] This requirement "serve[s] to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." Rose, 454 F.3d at 961. Thus, the Supreme Court "narrowed the class of persons eligible for confinement to those who are unable to control their dangerousness." Hendricks, 521 U.S. at 358. However, the Supreme Court "did not give to the phrase 'lack of control' a particularly narrow or technical meaning." Crane, 534 U.S. at 413. "It is enough to say that there must be proof of serious difficulty in controlling behavior." Id. The Ninth Circuit has recently noted that the Supreme Court "dismissed the contention that Hendricks required total or complete lack of control[.]" Rose, 454 F.3d at 962. Instead, the Constitution requires only "some lack-of-control determination." Id.

### 2. Decision of the Court of Appeal

The California Court of Appeal interpreted Cal. Pen. Code § 1026.5 ("Section 1026.5") to include the requirement that a jury find that Defendant's "mental deficiency, disorder, or abnormality, cause[s] serious difficulty in controlling the person's behavior," prior to ordering civil commitment in a state hospital.[8] This imparts in Section 1026.5 the constitutional requirement that only those "who suffer from a volitional impairment rendering them dangerous *beyond their control*" are involuntarily civilly committed, and aligns California law with Supreme Court

---

[7] Kansas v. Hendricks, 521 U.S. 346, 358 (1997); see, e.g., Rose v. Mayberg, 454 F.3d 958, 961 (9th Cir. 2006). Though Hendricks and its progeny Crane address state laws committing those with mental disorders relating to sexual violence, Crane indicated that it may have a broader application than solely sex crimes by emphasizing that civil commitment is based generally upon a person's danger to society. Kansas v. Crane, 534 U.S. 407, 412 (2002); see Richard S. v. Carpinello, 628 F. Supp. 2d 286 (N.D.N.Y. 2008). In addition, this ambiguity in the Supreme Court's precedent supports the Court of Appeal's application of Crane and Hendricks to Petitioner's case, since "[a] federal court may not overrule a state court for simply holding a different view from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell, 540 U.S. at 17.

[8] (Appeal at 9) (internal quotation omitted).) Section 1026.5 provides that a person who has committed a felony and "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others" may be involuntarily committed to a state hospital. Cal. Penal Code § 1026.5(b)(1). However, a person found not guilty by reason of insanity may not be kept in actual custody longer than the maximum state prison term to which he or she could have been sentenced for the underlying offense. Id. at § 1026.5(a). Section 1026.5(b)(8) provides for extension of commitments for a maximum of two years where a jury finds that the person is, beyond a reasonable doubt, mentally ill and a physical danger to others. Id.

8

precedent. (Appeal at 9 (internal quotation omitted, emphasis in original).) In addition, the California Court of Appeal noted: "We [have] held that a commitment extension could only be affirmed by the reviewing court if the record contained substantial evidence that the defendant had, at the very least, serious difficulty controlling his potentially dangerous behavior." (Id. (internal quotation omitted).)

Applying Section 1026.5, the Court of Appeal found the following:

> [The District Attorney's Section 1026.5 petition to extend Petitioner's commitment] attached reports, which alleged that [Petitioner] could not control his behavior. An attached report dated February 20, 2007, stated that [Petitioner] remains paranoid, delusional, hostile, and verbally abusive at times. [Petitioner] continues to deny that he has a mental illness, specifically that he denies being paranoid, delusional, or hostile. He also denies the need for treatment. The following incidents were [also] noted: on September 12, 2006[, Petitioner] threatened staff stating "I've killed people before, so give me the points that I deserve." On October 15, 2006[,] he threatened a peer in the dining room stating "I'm gonna cut off your penis." On October 14, 2006[, Petitioner] threatened the psychologist. On October 15, 2006[,] he had a physical altercation with a peer. [Additionally, during] the conference of November 27, 2006[, Petitioner] felt he should not be forced to take medications and that he should be released. [Petitioner] is often paranoid, delusional, hostile and verbally abusive. He continues to accuse staff (of a lack of qualifications/licensure, sexually harassing him, etc.) and threaten them with lawsuits and reports to licensure boards[.]
>
> Thus, the reports attached to the petition sufficiently included allegations, such as [Petitioner] had a physical altercation with a person, to indicate that [Petitioner] could not control his behavior.

(Appeal at 10.) The Court of Appeal also noted evidence of Petitioner's unpredictable behavior while in Napa State Hospital and while in court, and that Petitioner had pinched his doctor's chest when he was instructed to take medication. (Id. at 11.) The Court of Appeal relied on, *inter alia*, the following testimony from Petitioner and two experts:

> At the bench trial, David Joubert, a staff psychologist at Napa State Hospital, testified. He stated that his opinion was based on his regular contact with and observation of [Petitioner]. Joubert said that [Petitioner] denies that he is mentally ill . . . . The district attorney asked Joubert about [the] medication [Petitioner] was taking. Joubert confirmed that [Petitioner] took his medication but noted that [Petitioner] claimed . . . he was taking it to manage the stress of being on the unit and indicated that he would not need the medication if he were outside because he did not believe that he suffered from mental illness. [Petitioner] also denied that he had a substance abuse history. Joubert opined that if [Petitioner] again began to abuse substances, this behavior could put him at high risk to reoffend. . . .
>
> When asked whether [Petitioner] could be successful in an outpatient treatment setting, Joubert responded: "I believe that if—the problem I see with [Petitioner] at this time is that since he doesn't believe or doesn't acknowledge he has a mental illness, he's probably

less likely to continue with his medication if he's discharged or out of the hospital setting, since he states that he takes the meds mostly to deal with the stress on the unit. And if he's without medication, I believe there's a high—he's at high risk of his symptoms worsening, high risk of relapse. And that's my main concern with him." Further, he did not believe that [Petitioner] had developed any insight into the relationship between his mental illness and his criminal behavior.

Joubert also commented that [Petitioner's] "presentation" was unpredictable and varied from one day to the next. Once[,] Joubert approached [Petitioner] for standard cognitive testing and [Petitioner] responded: "I'm not going to do any testing. You're a moron. I'll see you in court." Joubert declared that he did not know what triggered this remark because the day before this interaction [Petitioner] "was actually quite pleasant."

Inder Bhanver, the treating psychiatrist at Napa State Hospital, also testified. If [Petitioner] did not take his medications, Bhanver would expect [Petitioner] would exhibit symptoms of paranoia. He stated that [Petitioner] was diagnosed with schizophrenia paranoia, which never resolves itself and will always require medication. . . . He summarized: "So that if [Petitioner] was not in a structured environment and not getting his medications on time, there would certainly be deterioration and increase in paranoid delusions, and then, that could cause a substantial risk of harm to others or himself." He admitted, however, that [Petitioner] never told him that he would not take his medications.

Bhanver opined that he did not believe that [Petitioner] recognizes his mental health issues. He explained: "So, I don't think that there is an understanding of that where you can talk to [Petitioner] and say, [Petitioner], you're having these symptoms, and you know—and where he might be able to respond, well, yes. I understand that, you know, I was having these symptoms from a mental illness perspective. And I need to continue my treatment and my monitoring. So, I don't see that understanding."

When asked whether he would continue to take medication if he left Napa State Hospital, he said that he would but that he was hoping that he could "get to a smaller maintenance dose." He said that, as a "professional," he should "take medication, tranquilizers" and see a psychiatrist because he would be dealing "with other types of stresses."

(Appeal at 3-6.) The Court of Appeal then concluded that "[Petitioner's] own testimony and statements during the proceeding, as well as the testimony of the two experts, provided substantial evidence that [Petitioner] lacked substantial control over his behavior." (Id. at 12.)

### 3.     Objective Reasonableness of Court of Appeal's Decision

The Court of Appeal properly identified the applicable Supreme Court due process precedent with respect to civil commitments. (Appeal at 7-9.) In addition, the Court of Appeal made a clear determination that Petitioner was unable to control his dangerous behavior. (Appeal at

10

12.) The Court of Appeal's analysis discusses, in detail, evidence on which it relied[9] to find that Petitioner suffers from paranoid schizophrenia and is unable to control his behavior. (Appeal at 9-12.) Petitioner contends that "there was no testimony offered to prove that petitioner lacked [the ability] to control his dangerous behavior." (Petitioner's Memorandum at 14.) In addition, Petitioner attempts to discount his unpredictable outbursts by contending "[h]e may simply have *chosen* to pinch the doctor's chest; one certainly cannot say beyond a reasonable doubt it was because he could not control himself." (Petitioner's Memorandum at 18 (emphasis in original).) However, the Supreme Court "did not give to the phrase 'lack of control' a particularly narrow or technical meaning." Crane, 534 U.S. at 413. In light of the Supreme Court's holding in Crane that "[i]t is enough to say there must be proof of serious difficulty in controlling behavior"[10] and the requirement that there need only be "some lack of control determination[,]"[11] the Court finds that the Court of Appeal's application of Supreme Court precedent was not objectively unreasonable.

Accordingly, Petitioner is not entitled to habeas relief as to his claim that the extension of his commitment violated his Fourteenth Amendment due process rights.

**C.     Certificate of Appealability**

At issue is whether the Court should issue a certificate of appealability.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Specifically, if a court denies a petition, a certificate

---

[9] Petitioner contends that the Court of Appeal committed error by only analyzing evidence supporting the trial court's findings, and that it failed to look at all the evidence in Petitioner's case. (Traverse at 5.) However, the Court finds that the evidence in this case, when viewed as a whole, fully supports the Court of Appeal's analysis. See Brecht v. Abrahamson, 507 U.S. 619 (1993); Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

[10] Crane, 534 U.S. at 413.

[11] Rose, 454 F.3d at 962.

11

of appealability may only be issued "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003); see also Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338. The Ninth Circuit recently described this standard as lenient. See Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (*en banc*).

Here, the Court finds that Petitioner has not made a substantial showing of the denial of his right to due process. Reasonable jurists could not disagree that there was proof at trial of Petitioner's dangerous behavior and serious difficulty in controlling his own behavior. The evidence relied on by the Court of Appeal showed that Petitioner denied that he had a mental illness, denied that he would need to continue medication if released from custody, and remained physically and verbally abusive and hostile. There is little room for disagreement that the requirements for an extension of commitment were met. Thus, the Court finds no basis for granting a certificate of appealability.

Accordingly, the Court will not issue a certificate of appealability.

## V.  CONCLUSION

The Court DENIES the Petition for Writ of Habeas Corpus as to all claims. A certificate of appealability will not be issued. Judgment shall be entered accordingly.

Dated: December 20, 2010

JAMES WARE  
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Karen Z Bovarnick Karen.Bovarnick@doj.ca.gov
Walter K. Pyle walt@wfkplaw.com

**Dated: December 20, 2010**                              **Richard W. Wieking, Clerk**

                                                          **By:      /s/ JW Chambers
                                                                 Elizabeth Garcia
                                                                 Courtroom Deputy**